# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1245 | **DATE** | 11/20/2003 |
| **CASE TITLE** | McGee vs. Corporate Express Delivery Systems | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, the Court denies both parties' motions for summary judgment (56 and 59). The case is set for trial on 2/2/04 at 9:45 a.m. Status hearing is set on 12/4/03 at 9:30 a.m., to discuss whether the trial will be a jury trial or a bench trial, as well as the possibility of settlement.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | NOV 26 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 83 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | NOV 26 2003 | |
| | | | date mailed notice | |
| OR | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LARRY McGEE, on behalf of himself and all other Plaintiffs similarly situated, known and unknown,<br><br>Plaintiff,<br><br>v.<br><br>CORPORATE EXPRESS DELIVERY SYSTEMS, f/k/a and/or d/b/a Velocity Express and VELOCITY EXPRESS,<br><br>Defendants. | Case No. 01 C 1245 |

DOCKETED
NOV 2 6 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Larry McGee sued his employer Velocity Express, a pick-up and delivery service, for failing to pay him overtime compensation as required by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Forty-four former drivers for Velocity Express have joined McGee's suit. In April 2001, Velocity Express filed a motion to dismiss the complaint, arguing that the overtime provisions of the FLSA did not apply to McGee because he fell under the motor carrier exemption to the Act. 29 U.S.C. § 213(b)(1). The Court treated the motion to dismiss as a motion for summary judgment and denied Velocity Express relief because it had failed to provide evidence that McGee – as opposed to the company generally – engaged in interstate commerce to a degree sufficient to bring him within the exemption. We explained: "[T]he activities of the enterprise as a whole are not controlling. Rather, '[t]he exemption in the [FLSA] depends upon

1



the activities of the individual employees.'" Order of Dec. 5, 2001 (quoting *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961)).

Velocity Express has filed a second motion for summary judgment, relying on the same arguments it raised previously. The plaintiffs have filed a motion for summary judgment, arguing that Velocity Express has failed to show that the plaintiffs were not owed overtime compensation. Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Velocity Express is not entitled to summary judgment because it has failed to heed this Court's earlier directive that to show each plaintiff is exempt from the overtime provisions of the FLSA, it must come forth with evidence that each plaintiff was engaged in activities that are covered by the motor carrier exemption. Velocity Express has only provided the Court with evidence generalizing the activities of all drivers. This aggregate evidence is not sufficient to determine which plaintiffs, if any, fall under the motor carrier exemption, but it is sufficient to raise a genuine issue of fact as to whether Velocity Express owes the plaintiffs overtime. Therefore, plaintiffs likewise are not entitled to summary judgment.

Although the parties have not come forward with enough evidence for the Court to determine as a matter of law which of the plaintiffs are entitled to overtime compensation, they have provided sufficient evidence for the Court to determine which types of job activities the plaintiffs would have to have performed at Velocity Express to be exempt from the overtime provisions of the FLSA. The conclusions reached by the Court today will be binding on the

parties should this case come to trial. Fed. R. Civ. P. 56(d).

**Introduction**

Velocity Express is a courier service that dispatches motor vehicle drivers to pick up and deliver parcels for customers. Def.'s Facts ¶¶ 3-4. The company has 265 facilities across the country, but all of the plaintiffs in this case were based at Velocity Express' Chicago facility located in Hodgkins, Illinois. *Id.* ¶ 13. The Chicago facility employed approximately thirty delivery drivers at any given time between 1999 and 2001. *Id.* ¶ 43. For financial reasons, Velocity Express laid off most of its drivers by July 2001, so none of the plaintiffs are currently employed by Velocity Express. Def.'s Facts ¶ 40.

Velocity Express transports everything from medical supplies and blood samples to checks and Marshall Field's packages. *Id.* ¶¶ 5-6. The Chicago facility has always held itself out as a courier involved in interstate commerce and has solicited business from customers outside of Illinois. *Id.* ¶¶ 16-17. Velocity Express has a permit from the U.S. Department of Transportation to engage in interstate commerce. *Id.* ¶ 9. Between 1999 and 2001, Velocity Express had five daily routes from the Chicago facility to Wisconsin and Indiana. *Id.* ¶ 21. Drivers also regularly picked up parcels from either Midway or O'Hare Airport and delivered the packages in the Chicago area. *Id.* ¶ 30. Velocity Express says the airport pick-ups were usually made with short notice, so any driver could be selected by the manager to make the trip. *Id.* ¶ 32. The company also states that occasionally a customer gave Velocity Express short notice for making out-of-state deliveries. *Id.* ¶ 33.

Between 1999 and 2001, sixty percent of Velocity Express' business involved delivering bundles of checks to and from bank post office boxes, customer banks' check processing centers,

3

the Federal Reserve Bank of Chicago, and the Chicago Clearing House. *Id.* ¶¶ 7-8. Velocity Express' customer banks included Bank of America, Bank One, Manufacturers Bank, Harris Bank, LaSalle Bank, Fleet Bank, First Security Bank, People's Bank and Northern Trust Bank. *Id.* ¶ 81. Bank of America accounted for twenty-five percent of Velocity Express' revenue between 1999 and 2001. *Id.* ¶ 86. Bank of America maintained post office boxes where the bank's customers could have their obligors send payments to be credited to their accounts. *Id.* ¶ 88-91. Some of the checks were drawn on banks located outside of Illinois and mailed from outside of Illinois. *Id.* ¶ 94. Velocity Express drivers would pick up the contents of the post office boxes hourly and deliver them to the bank's processing center. *Id.* ¶ 95. At the processing center, the bank would sort the checks and credit the payments to their customers' accounts. *Id.* ¶ 92. Then the checks would be sorted "for delivery to either the bank on which they were drawn, the Chicago Clearing House Association, or the Federal Reserve Bank of Chicago." *Id.* ¶ 99. Velocity Express drivers would pick up the sorted checks, and deliver them either to the Federal Reserve or the Chicago Clearing House, which would send the checks to out-of-state banks. *Id.* ¶ 101. Velocity Express provided the same delivery services for its other customer banks. *Id.* ¶¶ 96, 103.

Velocity Express maintains that its supervisors randomly assigned drivers to routes, frequently changed their route schedules as required and occasionally altered a driver's schedule so he could make an "on-demand" delivery, implying that an employee could be assigned to an out-of-state, airport or intrastate check pick-up and delivery route at any time. *Id.* ¶ 34-36, 46-66, 104-05. McGee and the forty-four additional plaintiffs maintain that they were never assigned to

an out-of-state delivery route[1] (Pl.'s Facts ¶¶ 3-8); and seventeen plaintiffs have submitted affidavits saying they were never pulled off their normal intrastate routes to make an out-of-state delivery.[2] Brooms-Gildart Aff. ¶ 2; Canders Aff. ¶¶ 2-3; Carvajal Aff. ¶ 2; Cole Aff. ¶ 4; Easter Aff. ¶¶ 2, 5; Goodman Aff. ¶¶ 2-3; Guiterrez Aff. ¶ 4; Jasinski Aff. ¶¶ 2-3; Lane Aff. ¶ 4; Lewis Aff. ¶¶ 2-4; Lundrum Aff. ¶¶ 2-3; Martin Aff. ¶ 2; Mason Aff. ¶¶ 2-3; Mitchell Aff. ¶ 2; McGee Aff. ¶ 1; Slate Aff. ¶ 4; and Susana Aff. ¶¶ 2-3. Thus the parties dispute to what degree – if any – the plaintiffs' duties included interstate, airport or check pick-ups and deliveries.

**Analysis**

The Fair Labor Standards Act requires employers to pay employees one and one-half times their normal hourly wage for each hour they work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). However, the FLSA's overtime provisions do not apply to employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [49 U.S.C. § 31502]." *Id.* § 213(b)(1). This exemption, commonly referred to as the motor carrier exemption, applies

> to those employees . . . whose work involves engagement in activities consisting wholly or in part of a class of work which is defined (i) as that of a driver . . . , and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(b)(2). The exemption must be construed narrowly against the employer. *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392

---

[1] The notice sent to the plaintiff class was only sent to those Velocity Express drivers who, like McGee, claim to have made deliveries only in Illinois.

[2] An eighteenth affidavit was filed by John Jones, but he admits that on two occasions he made deliveries to Gary and East Chicago, Indiana. Jones Aff. ¶ 2.

(1960)).

Velocity Express "bears the burden of proving the application of [the] exemption." *Klein v. Rush-Presbyterian-St. Luke's Medical Center*, 990 F.2d 279, 283 (7th Cir. 1993) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)). As this Court has stated before, because "[t]he exemption . . . depends upon the activities of the individual employees," *Goldberg*, 291 F.2d at 235, Velocity Express must come forward with evidence as to "the character of the activities involved in the performance" of each plaintiff's job in order for the Court to determine whether Velocity Express owes is employees overtime compensation. 29 C.F.R. § 782.2(b)(2). The activities of one plaintiff cannot justify a blanket exemption for the other forty-four plaintiffs.

Similarly, the job activities of a plaintiff in one week do not determine the plaintiff's exempt status for his entire tenure of employment. An employee can be exempt from the FLSA during some weeks of his employment and subject to the FLSA other weeks. For those weeks that an employee performs a job whose duties "regularly or from time to time" affect the safety of motor vehicles in interstate commerce, the employee falls within the motor carrier exemption. *Id.* § 782.2(b)(3). It does not matter what proportion – if any – of the employee's workweek activities involve interstate commerce, so long as the employee has a job whose duties involve interstate commerce. *Id.* But the exemption does not apply if the "continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis." *Id.* Furthermore, "[i]f in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in

6

interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job." *Id.* In other words, the exemption only applies to an employee for those weeks that he has job duties that substantially affect the safety of vehicles in interstate commerce and only one day of interstate activity in a week is enough to exempt the driver from the FLSA for that week. The Department of Labor recognizes that an employee's exempt status may vary week to week if the employer shifts the employee "from one job to another periodically or on occasion." *Id.* § 782.2(b)(4). Thus, the only way to determine the overtime compensation owed an employee is to look at the job duties held by the employee for each week of employment.

The parties in this case do not dispute that all the plaintiffs were employed as drivers and, as such, they affected the safety of operation of motor vehicles on the public highways. *Benson v. Universal Ambulance Service, Inc.*, 675 F.2d 783, 786 (6th Cir. 1982) ("It would appear to be beyond question that the driver of a common carrier vehicle directly affects the safety of operation of that vehicle."); *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972) ("It is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving."); *Turk v. Buffets, Inc.*, 940 F. Supp. 1255, 1261 (N.D. Ill. 1996) (finding a driver's affect on the safety of operation of motor vehicles is rarely de minimis). The parties disagree, however, on whether the plaintiffs were engaged in interstate commerce. Velocity Express argues that the plaintiffs engaged in interstate commerce in that their intrastate transporting of bank checks was part of a continuous stream of interstate commerce, and they had a reasonable expectation of being reassigned to drive an interstate, airport or check delivery route even if their normal routes involved only intrastate driving.

7

A driver does not have to cross state lines to engage in interstate commerce. The Secretary of Transportation has jurisdiction over a motor carrier under 49 U.S.C. § 13501 "if the goods being transported within the borders of one State are involved in a 'practical continuity of movement' in the flow of interstate commerce." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 223 (2d Cir. 2002) (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993) ("Transportation within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination."). Therefore, "the interstate commerce requirements of the section 13(b)(1) exemption are satisfied where it appears that a motor carrier employee is engaged as a driver . . . in transportation by motor vehicle which, although confined to a single State, is a part of an interstate movement of the goods or persons being thus transported so as to constitute interstate commerce within the meaning of the Fair Labor Standards Act." 29 C.F.R. § 782.7(b)(1). However, when goods are delivered from out of state to a storage facility, intrastate transportation of the goods from the storage facility does not constitute interstate commerce "if the shipper ha[d] no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment." *Id.* § 782.7(b)(2).

Velocity Express contends that when its drivers picked-up and delivered checks they were participating in the continuity of interstate movement of the checks. The plaintiffs respond that Velocity Express has failed to produce evidence of what the customer banks' fixed and persisting intent was. But the fundamental flaw with the plaintiffs' logic is that they misidentify whose intent is determinative. "Whether the transportation is of an interstate nature can be 'determined

by reference to the intended final destination' of the transportation when the ultimate destination was envisaged at the time the transportation commenced." *Bilyou*, 300 F.3d at 223-24 (quoting *Project Hope v. M/V Ibn Sina*, 250 F.3d 67, 74 (2d Cir. 2001)). That means that it is "[t]he intent at the time transportation commences [that] 'fixes the character of the shipment for all the legs of the transport within the United States.'" *Id.* at 224 (quoting *Project Hope*, 250 F.3d at 75). Therefore, it was the intent of the people who sent the checks to the banks' post office boxes that determined what was the final destination of the checks. The authors of the checks plainly did not intend the post office box to be the final destination for the checks. They sent the checks to the bank's post office box, intending that they be received by the bank, the payee's account credited, and the check returned to the bank on which it was drawn by the author. Thus, when Velocity Express' drivers handled the checks, they were in the middle of their interstate journey.

The time the checks sat in the post office boxes was too short to break the continuity of movement. The Supreme Court has long held that when goods are received at a distributor's warehouse from out-of-state with the intent that they be delivered by the distributor within the state to a predetermined purchaser, the pause at the warehouse does not conclude the continuity of interstate movement. *Walling*, 317 U.S. at 569. The Supreme Court explained:

> The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency . . . if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended.

*Id.* at 568. *See also Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir. 1997) (finding goods

9

were in "'continuous transportation'" until delivered to defendant's customers and continuity was not interrupted by the time the goods were stored in defendant's warehouse); *Foxworthy*, 997 F.2d at 673-74 (finding driver's intrastate dairy delivery route involved interstate commerce because he distributed goods produced out-of-state that were stored in his employer's facility for less than three days before he delivered them); *Jones v. Centurion Investment Assoc., Inc.*, 268 F. Supp. 2d 1004, 1012 (N.D. Ill. 2003) (finding the "temporary pause" in the movement of bread trays picked up by the plaintiff and delivered to his employer's facility where they awaited shipment out-of-state did "not mean that they were no longer in interstate commerce"). As discussed above, the banks' post office boxes were not the final destinations of the checks; they were a place of short-term storage. Velocity Express drivers emptied the post office boxes every hour, so the storage time was much shorter than in other cases in which the courts have found the delivery drivers exempt from the overtime provisions of the FLSA. Thus, the checks were still actively in interstate commerce at the time Velocity Express' drivers picked them up.

The plaintiffs argue that the processing of the checks broke this continuity of movement. They rely on *Goldberg v. Faber Industries*, in which the Seventh Circuit found that fifteen drivers who drove intrastate routes to collect meat scraps that were processed at their employer's facility before being shipped out of state were not engaged in interstate commerce. However, the processing in *Golberg* is distinguishable from the processing and sorting of the checks in this case. In *Goldberg* the scraps were converted into grease and animal food; in this case, the checks were not altered by the processing. The checks were in the same form when Velocity Express' drivers picked them up from the processing centers as they had been when they were dropped off there. In fact, the checks were in the same form throughout their interstate journey. Thus

10

processing of the checks by the banks' processing centers and sorting by Velocity Express drivers did not interrupt the continuity of movement. Furthermore, even if the processing severed the interstate movement of the checks, the checks began a second interstate journey when Velocity Express' drivers picked them up from the processing centers and delivered them to the Chicago Clearing House Association, which would send the canceled checks back to the authors' out-of-state banks. The transportation of checks bound for banks outside of Illinois involves interstate commerce. *See Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 182 (11th Cir. 1991). For these reasons, Velocity Express does not owe the employee overtime for those weeks that he was assigned to make an interstate delivery or pick-up and deliver bank checks.

Velocity Express drivers also picked up packages from Midway and O'Hare airports on occasion. The parties do not dispute that these packages came from out of state, and the airport was not their final destination. Thus for those weeks that an employee was assigned to pick up a package at the airport, he was not entitled to overtime. The employee was exempt for the full week even if interstate, airport or check pick-ups and deliveries constituted only a small percentage of the driver's weekly schedule. In *Morris v. McComb*, 332 U.S. 422 (1947), the Supreme Court held that drivers fell within the motor carrier exemption even though only four percent of their deliveries involved interstate commerce. The governing Department of Labor regulations also make clear that for those weeks that a driver's duties involve interstate commerce, he is exempt from the FLSA "regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek." 29 C.F.R. § 782.2(b)(3).

The remaining question is whether the driver must *actually* deliver the checks, pick up a

11

package at the airport, or cross state lines to be exempt, or whether it is enough that the driver *could be* called upon to drive such routes. Velocity Express argues that it does not owe its drivers overtime because all of them *could have been* assigned to make an out-of-state, airport or check pick-up or delivery. The Department of Transportation has stated that in order to determine whether a driver is subject to the department's jurisdiction (and, therefore, exempt from the FLSA), the court must look to the "activities or *likely activities*" of the individual driver. Notice of Interpretation, 46 Fed. Reg. 37902 (July 23, 1981) (emphasis added). "If in the regular course of employment a driver is, *or could be*, called upon to transport a shipment in interstate commerce the driver would be subject to the [department's] jurisdiction under 49 U.S.C. 304." *Id.* (emphasis added). In *Morris* the Supreme Court found all the drivers employed by the defendant engaged in interstate commerce – even though two employees had never made an interstate delivery. The Court based its decision in part on the fact that the company indiscriminately assigned its drivers to routes. *Morris*, 332 U.S. at 433. Similarly, in *Starrett v. Bruce*, 391 F.2d 320 (10th Cir. 1968), the court found that an employee who did not drive an interstate route fell under the motor carrier exemption because the carrier solicited interstate work and indiscriminately assigned drivers to interstate routes. *Starrett*, 391 F.2d at 323. Thus, the regulations seem to make clear that to prevail, Velocity Express does not have to show that its drivers *actually* engaged in interstate commerce.

But to demonstrate a driver is exempt from the overtime provisions of the FLSA, Velocity Express must do more than simply assert that it assigned routes indiscriminately. Rather, it must show that because of its assignment procedure, the driver was likely to engage in interstate commerce for the week. In *Goldberg* the Seventh Circuit noted that in *Morris* the

12

Supreme Court had found two drivers fell under the exemption even though they had never made trips in interstate commerce, but explained that those "two drivers were subject, at any time, to be assigned to interstate trips, and that at some time during the year they would, *in all likelihood*, share in the carrier's interstate commerce trips." *Goldberg*, 291 F.2d at 235 (emphasis added). The exemption does not apply "if there is no possibility of the individual driver doing interstate driving or if the possibility of interstate driving is remote." 46 Fed. Reg. 37902 (citations omitted). Thus it is not enough for Velocity Express to show that when a vacancy arises, the unmanned route is randomly reassigned. "That unexpected vacancies may be filled indiscriminately does not establish that all drivers could at some time travel interstate routes. Without sufficient evidence to the contrary, we presume that a driver once assigned an intrastate route will in all likelihood remain on that route." *Kosin v. Fredjo's Enterprises, Ltd.*, No. 88 C 5924, 1989 WL 13175, at *4 (N.D. Ill. Feb. 14, 1989).

Velocity Express has presented evidence that its supervisors randomly assigned interstate, airport and check delivery routes to its drivers. But the plaintiffs have submitted affidavits from seventeen drivers who attest that they were never taken off their permanent intrastate routes,[3] belying Velocity Express' claim that the plaintiffs really faced the possibility of being indiscriminately assigned to a different route each week. The evidence presented by the plaintiffs, though incomplete, suggests that Velocity Express assigned drivers to routes on a

---

[3] Although a majority of the plaintiffs have not submitted affidavits rebutting Velocity Express' claim that they could be randomly assigned to interstate routes, Velocity Express is not entitled to summary judgment on their claims. As this Court has explained repeatedly, Velocity Express must come forth with evidence as to the job activities of each plaintiff. Velocity Express has provided route sheets that indicate that one of the affiants, Angel Susana, made a delivery to Indiana on July 24, 2001. Def.'s Resp. Facts Ex. B. But this evidence is only sufficient to show that Susana was not entitled to overtime for the week of July 24.

permanent or quasi-permanent basis, and routes were randomly reassigned only when a driver did not come in to work and his route had to be covered by someone else. The Court will not apply the exemption to an employee for those weeks he was assigned permanently to a route that did not involve interstate commerce unless the defendant can show that the driver really was likely to be reassigned to an interstate, airport or check delivery route. The conflicting evidence presented by the parties creates a genuine issue of fact as to whether in any given week, Velocity Express' drivers actually were likely to engage in interstate commerce.

In summary, Velocity Express can show that a driver is not entitled to overtime under the FLSA only if it can show that for each week of his employment, the driver was assigned or was likely to be assigned to a check delivery, interstate or airport route. For those weeks that a driver was assigned to routes involving check deliveries, interstate driving or an airport pick-up or was taken off of his normal route and randomly assigned to a different route, Velocity Express does not owe the driver overtime. If Velocity Express can show that a driver did not have a regular route during a week, and, therefore, was subject to being randomly assigned to a route that was likely to involve interstate commerce, the driver falls within the motor carrier exemption for that week. But for those weeks that a driver was assigned solely to a route that did not involve check deliveries, interstate driving or a pick-up at the airport, the driver is entitled to overtime under the FLSA unless Velocity Express can prove that his route was likely to change to one involving interstate commerce.

The plaintiffs argue that they are entitled to liquidated damages equal to twice the back pay they are owed because Velocity Express did not make a good faith inquiry before deciding it did not owe its employees overtime. The Court finds it premature to rule on the availability of

14

liquidated damages: it would be inappropriate to determine whether Velocity Express acted in bad faith before determining if it erroneously denied its employees overtime pay. Velocity Express argues that the plaintiffs have waived their claim that the three-year statute of limitations is triggered because the defendant's conduct was willful. The Court finds the plaintiffs did not waive this claim by not moving for summary judgment on it. A party is not required to move for summary judgment on a claim to preserve it for trial.

## Conclusion

For the reasons stated above, the Court denies both parties' motions for summary judgment [docket # 56 and 59]. The case is set for trial on February 2, 2004 at 9:45 a.m. The case is set for a status hearing on December 4, 2003 at 9:30 a.m. to discuss whether the trial will be a jury trial or a bench trial, as well as the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: November 20, 2003